[No. 56223-7. En Banc. April 26, 1990.]

MULTICARE MEDICAL CENTER, ET AL, *Respondents,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, ET AL, *Petitioners.*

574

Kenneth O. Eikenberry, Attorney General, and Patricia K. Nightingale, Assistant, for petitioners.

Bennett & Bigelow, David A. Bennett, and Sanford E. Pitler, for respondents.

DURHAM, J.—The present case tests the legality of the Department of Social and Health Services' (DSHS) variable ratable reductions to MI–GAU reimbursement payments to participating hospitals. The trial court invalidated the program and held that DSHS was not purchasing MI–GAU hospital care as authorized by RCW 74.09.120. We reverse.

DSHS is an administrative agency of the State of Washington charged with the administration of two state–funded medical care services programs:[1] the medical care services program, General Assistance Unemployable (GAU), and the limited casualty program, Medically Indigent (MI). GAU is governed by RCW 74.09.035. Under the GAU program,

---

[1] In addition, DSHS purchases hospital care from the plaintiff hospitals for medical assistance recipients that are eligible under Title XIX of the Social Security Act.

medical care services may be provided to recipients of general assistance in accordance with medical eligibility requirements established by DSHS. GAU provides assistance to unemployable persons not eligible for, or not receiving, federal aid or assistance. WAC 388–80–005(31). MI is governed by RCW 74.09.700. A person who has an acute and emergent medical condition and meets the financial eligibility requirements set forth in WAC 388–100 may be eligible for the MI program. The statutes governing both the GAU program and the MI program expressly mandate that such services are to be provided "[t]o the extent of available funds". RCW 74.09.035(1) and RCW 74.09.700(1).

In the present case, the six plaintiff hospitals[2] (Hospitals) have provided both MI and GAU inpatient hospital care. The dispute concerns reductions in the reimbursement payments by DSHS for that inpatient care.

RCW 74.09.120 is the general authority for DSHS to purchase certain health care and for hospitals to receive payment for their services. The statute provides, in relevant part, that DSHS

> shall purchase hospital care by contract or by all inclusive day rate, or at a reasonable cost based on a ratio of charges to cost.

RCW 74.09.120.

In the present case, DSHS contends that it purchased MI–GAU inpatient hospital care pursuant to a series of unilateral contracts, the terms of which are set forth in a document entitled "Core Provider Agreement" (Agreement).[3] According to DSHS, the Agreement is a standard contract required by WAC 388–87–007 which, together with provider participation in the program, constitutes the

---

[2]The following hospitals are involved in the litigation: Multicare Medical Center, Stevens Memorial Hospital, Lakewood General Hospital, Good Samaritan Hospital, Yakima Valley Memorial Hospital Association, and Kadlec Medical Center.

[3]The Agreement refers generally to the medical care program and explicitly refers to the Medicaid program authorized by Title XIX of the Social Security Act.

agreement between DSHS and the hospital. DSHS began using the Agreement in September 1981, pursuant to WAC 388-87-007, effective September 1980.[4]

The Agreement provides that "[r]eimbursement for covered services will be made according to the Schedule of Maximum Allowances, the drug formulary and other applicable payment levels or schedules. This must be accepted as sole and complete remuneration for services covered under the program" and "[a] provider shall bill usual and customary charges or according to instructions issued" by DSHS. The Agreement does not specify the reimbursement rates which are to be paid to the hospitals for the MI-GAU care. Rather, applicable payment levels for hospitals are established by DSHS pursuant to regulation. WAC 388-87-070.

From 1981, when DSHS first began using the Agreement, until July 1, 1982, DSHS paid for hospital inpatient care for both MI-GAU and Title XIX patients in an identical manner by determining reimbursable costs according to Medicare cost reimbursement methods pursuant to WAC 388-87-070.

Between July 1, 1982 and February 15, 1983, pursuant to WAC 388-87-070(2) then in effect, DSHS paid hospitals for care provided to MI-GAU patients and Title XIX patients in an identical manner, paying the hospitals' operating expenses for those patients as approved by the Washington State Hospital Commission (Hospital Commission). This method paid the hospitals' charges for the particular patient multiplied by the ratio of Hospital Commission-approved operating expenses to Hospital Commission-approved total rate setting revenue. This ratio is known as the "OE/TRSR" ratio.

Between February 15, 1983 and June 30, 1983, DSHS did not pay hospitals in an identical manner for MI-GAU and Title XIX care. In response to a financial shortfall, DSHS

---

[4]In September 1980, when WAC 388-87-007 first required use of the Agreement, the MI and GAU programs did not exist in their present form.

implemented the first variable ratable reduction on MI–GAU payments.[5] Although DSHS made no reductions in Title XIX payments during this period, DSHS reduced OE/TRSR–based MI–GAU payments by an amount which varied from 4.4 percent to 20.1 percent depending upon the particular hospital's percentage of revenue from full charge paying patients.[6]

DSHS's goal in establishing the variable ratable reduction was to require those hospitals best able to absorb losses to do so whenever DSHS concluded that it was without adequate funds. Accordingly, the variable ratable reduction formula adopted in 1983 grouped hospitals according to their base of full charge paying patients. The hospitals with the smallest base of full–charge paying patients had their MI–GAU reimbursement payments reduced by a smaller percentage of their total rate–setting revenue than the other hospitals.

Between July 1, 1983 and March 31, 1984, DSHS paid for MI–GAU care at the same rate as Title XIX care. No variable ratable reduction was imposed; rather, DSHS paid a hospital's full OE/TRSR ratio.

Between April 1, 1984 and April 30, 1985, DSHS did not pay hospitals in an identical manner for MI–GAU and Title XIX care. Although DSHS made no reductions in Title XIX payments to hospitals, DSHS reduced MI–GAU payments by a variable ratable reduction varying from 2.7 percent to 22.9 percent depending upon the particular hospital's percentage of revenue from full charge paying patients.[7]

---

[5]State Register 83–05–041 (1983) (emergency rule); WAC 388–87–070(3) (filed February 15, 1983).

[6]"Full charge paying patients" is the term used to identify patients that do not come within one of the following categories: Medicare, Medicaid, bad debt, charity, or other contractual allowances (MMBC).

[7]State Register 84–08–040 (1984) (emergency rule); State Register 84–11–070 (1984) (filed May 22, 1984, adding WAC 388–87–070(4)); State Register 84–20–055 (1984) (emergency rule); State Register 84–21–078 (1984) (filed October 18, 1984,

578

On January 1, 1985, DSHS altered the reimbursement method for most Title XIX and MI–GAU care from the OE/TRSR method to a Diagnosis Related Group (DRG) payment method. Under the DRG method, a hospital receives a fixed fee, the amount of which depends in part upon a patient's diagnosis and the hospital's historic average cost per discharge.

Between May 1, 1985 and June 30, 1985, DSHS increased the variable ratable reductions.[8] Accordingly, DSHS reduced reimbursement payments for MI–GAU care by a variable ratable reduction varying from 40 percent to 60 percent depending upon the hospital's revenue from full charge paying patients. No reductions, however, were made for Title XIX payments.

Beginning July 1, 1985, DSHS based the variable ratable reductions on the amount of revenue a hospital received from MMBC. Between July 1, 1985 and September 30, 1985, although DSHS made no reductions in Title XIX payments, DSHS reduced DRG–based payments for MI–GAU patients by a variable ratable reduction of between 2.7 percent and 23.4 percent depending upon the particular hospital's percentage of MMBC revenue.[9]

In sum, under the 1983 regulation, there was a 5–tiered variable with an overall average 18.7 percent reduction and the hospitals were classified according to their percentage of full–charge paying patients. In 1985, the regulation was modified to create a 3–tiered variable with an overall average 38 percent reduction with hospitals classified according to their percentage of non–full–charge paying patients (the converse of the 1983 regulation).

---

adding WAC 388–87–070(5)); State Register 84–23–039 (1984) (emergency rule); State Register 85–03–073 (1985) (filed January 17, 1985, amending WAC 388–87–070(5)(e)).

[8]State Register 85–10–008 (1985) (emergency rule); WAC 388–87–070(5)(e)(i), (ii).

[9]State Register 85–14–070 (1985) (emergency rule); State Register 85–17–033 (1985) (filed August 15, 1985, adding WAC 388–87–070(6)).

For admissions between October 1, 1985 and the date of trial, DSHS made no reductions in Title XIX payments. However, DSHS applied a variable ratable reduction in each hospital's payment for MI–GAU care. Under WAC 388–87–070(6), a hospital's payment is reduced by 20 percent, 40 percent, or 60 percent depending upon the particular hospital's percentage of total rate–setting revenue.[10] DSHS stated that the ratable reduction is necessary to maintain DSHS's medical assistance expenditures within the level of appropriated funds.

On November 5, 1985, DSHS held a public hearing which addressed the adoption of the amendments to WAC 388–87–070(6). Representatives of the Hospitals attended and submitted written materials and oral testimony in opposition to the proposed ratable reductions. On November 15, 1985, the amendment was permanently adopted.[11]

In October 1985, when WAC 388–87–070(6) was adopted as an emergency measure, the most complete data for all hospitals was the Hospital Commission 1983 year–end conformance (YEC) data which showed each hospital's percentage of MMBC revenue. In administering WAC 388–87–070(6), which implemented the variable ratable reductions, DSHS used the 1983 YEC data from October 1985 until the date of trial. Although new data became available annually, and the Hospitals requested DSHS to use the new MMBC data in administering the variable ratable reductions, DSHS did not adjust the hospital's ratable percentages in accordance therewith. Had DSHS used the new data, some of the Hospitals would have received an increase in MI–GAU reimbursement payments.

[10]DSHS revised WAC 388–87–070(6), which is the administrative regulation which sets forth the reimbursement terms for the MI–GAU programs. The regulation classifies hospitals into three groups and authorizes DSHS to reduce the amount it would otherwise pay each hospital by a percentage set for each group. State Register 85–20–098 (1985) (emergency rule); State Register 85–23–034 (1985) (filed November 15, 1985, amending WAC 388–87–070(6)).

[11]WAC 388–87–070(6) was adopted on an emergency basis on October 1, 1985 and on a permanent basis on November 15, 1985.

In March 1986, the Hospitals sued DSHS seeking declaratory and injunctive relief. The Hospitals challenged the legality of the variable ratable reductions. In addition, the Hospitals alleged that Medicare revenue should not be included in the ratable computation and that DSHS used outdated data in the ratable computations.

A bench trial was held November 2 and 3, 1988 in Thurston County Superior Court. On January 26, 1989, the trial court filed its written opinion, ruling that RCW 74.09-.120 did not authorize imposition of *variable* ratable reductions,[12] that DSHS did not purchase hospital care "by contract" within the meaning of RCW 74.09.120, and that DSHS acted arbitrarily and capriciously in failing to adjust the MI–GAU percentage reductions as new and complete patient–mix data became available.

In addition, the trial court concluded that the reimbursement rate for MI–GAU hospital care was not contracted for, but was unilaterally set by DSHS. Thus, the court determined that DSHS was obligated to purchase hospital care by either an "all inclusive day rate" or by a rate which constituted payment of "reasonable cost based on a ratio of charges to cost." The court concluded that DSHS did neither.

On April 13, 1989, in support of its decision, the trial court entered extensive findings and conclusions.[13] The court then entered an order which required DSHS to pay the Hospitals "an amount determined as reasonable cost based on the ratio of charges to cost without ratable reduction or other reduction" and that DSHS be prohibited from

---

[12]Although the trial court found that DSHS was within its authority in ratably reducing payments to hospitals for MI–GAU patients, the court found that *variable* ratable reductions were not consistent with the legislative authority of DSHS because the reduction formula ties reduction variations among hospitals to something other than costs.

[13]A clean set of both the findings and conclusions and the order were filed on May 18, 1989 but made effective nunc pro tunc to April 13, 1989.

paying for MI–GAU inpatient hospital care pursuant to WAC 388–87–070(6).

On April 21, 1989, DSHS filed a motion for reconsideration, which was denied on June 8, 1989. On June 23, 1989, pursuant to RAP 2.3(b)(2), DSHS filed a motion for discretionary review seeking review of the findings of fact, conclusions of law and order entered April 13, 1989 and the order denying defendant's motion for reconsideration entered June 8, 1989. On July 21, 1989, this court granted DSHS's motion.

Although the sequence of events leading to this dispute are somewhat complicated, the issues presented on appeal are not complex. This case presents three questions. First, did DSHS purchase MI–GAU hospital care by contract pursuant to RCW 74.09.120? Second, are the past and present versions of WAC 388–87–070 valid? Third, did DSHS act arbitrarily and capriciously in administering WAC 388–87–070? We address these issues seriatim.

## I
### CONTRACT ANALYSIS

Under RCW 74.09.120, DSHS has the authority to purchase MI–GAU hospital care by means of any of three prescribed methods. Specifically, the statute provides that DSHS "shall purchase hospital care by contract or by all inclusive day rate, or at a reasonable cost based on a ratio of charges to cost." RCW 74.09.120. In the present case, it is agreed that DSHS does not utilize either the day rate method or the reasonable cost method in purchasing MI–GAU hospital care. Accordingly, our inquiry is limited to determining whether DSHS is purchasing hospital care "by contract" as required by the statute.

The trial court correctly determined that there was no bilateral contract.[14] DSHS contends, however, that a unilateral contract arose from the parties' conduct. This raises

---

[14]DSHS's theory that it purchases MI–GAU hospital care pursuant to a series of unilateral contracts was not argued until the motion for reconsideration, which

two basic issues: (1) does the "by contract" language in RCW 74.09.120 include unilateral contracts; and (2) if so, is there a valid unilateral contract between DSHS and the Hospitals?

■ In deciding if RCW 74.09.120 contemplates purchase of MI–GAU hospital care by unilateral contract, we first look to the statutory language.[15] *Everett Concrete Prods., Inc. v. Department of Labor & Indus.,* 109 Wn.2d 819, 822, 748 P.2d 1112 (1988). As a threshold matter, *State v. Theilken,* 102 Wn.2d 271, 684 P.2d 709 (1984), we note that the statute is not ambiguous. The Legislature specifically mentioned the three permissible methods by which DSHS could purchase MI–GAU hospital care. Although the Hospitals invite us to look beyond the statutory language and to consider the legislative history of RCW 74.09.120, such an inquiry is inappropriate. Because RCW 74.09.120 is unambiguous, its meaning must be derived from its language alone. *In re Eaton,* 110 Wn.2d 892, 898, 757 P.2d 961 (1988); *PUD 1 v. Public Empl. Relations Comm'n,* 110 Wn.2d 114, 118, 750 P.2d 1240 (1988); *Everett Concrete Prods., Inc.,* 109 Wn.2d at 822; *Clark v. Horse Racing Comm'n,* 106 Wn.2d 84, 91, 720 P.2d 831 (1986); *Human*

---

took place well after the trial court issued its opinion and its findings and conclusions. Because the trial court's findings and conclusions relating to this issue were based on bilateral contract analysis, our traditional deference to trial court findings and conclusions would be inappropriate here. Accordingly, we consider the unilateral contract issue independent of the trial court's findings and conclusions.

[15]On matters of statutory interpretation, the ultimate authority to determine the meaning and purpose of the statute is vested in this court. *Overton v. Economic Assistance Auth.,* 96 Wn.2d 552, 555, 637 P.2d 652 (1981). Because the interpretation of a statute is a question of law, *Condit v. Lewis Refrigeration Co.,* 101 Wn.2d 106, 676 P.2d 466 (1984); *Codd v. Stevens Pass, Inc.,* 45 Wn. App. 393, 398, 725 P.2d 1008 (1986), *review denied,* 107 Wn.2d 1020 (1987); *Mike's Rental Mach., Inc. v. Corbett Draw Farms, Inc.,* 44 Wn. App. 257, 721 P.2d 1000, *review denied,* 107 Wn.2d 1003 (1986), our review is de novo. *Everett Concrete Prods., Inc. v. Department of Labor & Indus.,* 109 Wn.2d 819, 823, 748 P.2d 1112 (1988). Accordingly, we interpret RCW 74.09.120 independently of the trial court's interpretation.

*Rights Comm'n v. Cheney Sch. Dist. 30,* 97 Wn.2d 118, 121, 641 P.2d 163 (1982).

■ The meaning to be afforded the term "contract", however, is more complicated. We begin by looking to see if the Legislature has defined the particular term. Where, as here, the Legislature has not done so, we follow the general rule of statutory interpretation that an undefined term is afforded its common law meaning. *Cowles Pub'g Co. v. State Patrol,* 109 Wn.2d 712, 720, 748 P.2d 597 (1988) (citing *Hearst Corp. v. Hoppe,* 90 Wn.2d 123, 580 P.2d 246 (1978)); *In re Brazier Forest Prods., Inc.,* 106 Wn.2d 588, 595, 724 P.2d 970 (1986).[16]

■■ The term "contract" is a well established legal term which, under common law, includes unilateral contracts. In Washington, the term "contract" has long been recognized to include both bilateral and unilateral contracts. In *Cook v. Johnson,* 37 Wn.2d 19, 221 P.2d 525 (1950), the court stated that "[t]he law recognizes, as a matter of classification, two kinds of contracts—bilateral and unilateral." *Cook,* at 23. *See also Browning v. Johnson,* 70 Wn.2d 145, 422 P.2d 314, 430 P.2d 591 (1967); *Saletic v. Stamnes,* 51 Wn.2d 696, 321 P.2d 547 (1958); *Higgins v. Egbert,* 28 Wn.2d 313, 182 P.2d 58 (1947). Thus, it appears that RCW 74.09.120 allows DSHS to purchase MI–GAU hospital care by both bilateral and unilateral contract.

■ We then turn to the facts of this case to determine if a unilateral contract exists between the parties. A unilateral contract consists of a promise on the part of the offeror and performance of the requisite terms by the offeree. *Higgins*

---

[16]*See also Johnson v. Department of Empl. Sec.,* 112 Wn.2d 172, 177, 769 P.2d 305 (1989) ("[w]hen the Legislature uses words of common meaning, that meaning will be applied to the statutory language unless it leads to absurd or incongruous results"); *Dennis v. Department of Labor & Indus.,* 109 Wn.2d 467, 479–80, 745 P.2d 1295 (1987) ("where a term is not defined in the statute, the term must be accorded its plain and ordinary meaning unless a contrary intent appears"); *Group Health Coop. of Puget Sound, Inc. v. Department of Rev.,* 106 Wn.2d 391, 401, 722 P.2d 787 (1986); *New York Life Ins. Co. v. Jones,* 86 Wn.2d 44, 47, 541 P.2d 989 (1975).

*v. Egbert, supra* at 317.[17] The essential distinction between a unilateral contract and a bilateral contract is the method of acceptance. In a unilateral contract

> the offer or promise of the one party does not become binding or enforcible until there is performance by the other party, whereas, [in a bilateral contract], it is not performance which makes the contract binding, but rather the giving of a promise by the one party for the promise of the other.

*Higgins v. Egbert, supra* at 317–18.[18] In other words, under a unilateral contract, an offer cannot be accepted by promising to perform; rather, the offeree must accept, if at all, by performance, and the contract then becomes executed. *Cook,* at 23. The Hospitals claim that no unilateral contract ever formed between themselves and DSHS due to a lack of consideration and the absence of mutual intent.[19] These issues will be discussed separately.

## Consideration

■ In a unilateral contract, consideration consists of the offeree performing the requisite terms of the offer. *Browning v. Johnson,* 70 Wn.2d at 148–49; *Higgins v. Egbert,* 28 Wn.2d at 317. As a general rule, however, an offeree's performance of a preexisting legal obligation is not valid

---

[17]*See also Browning v. Johnson,* 70 Wn.2d 145, 148, 422 P.2d 314, 430 P.2d 591 (1967); *Millett v. Sampson,* 41 Wn.2d 442, 444, 249 P.2d 773 (1952); *Cook v. Johnson,* 37 Wn.2d 19, 23, 221 P.2d 525 (1950); *BC Tire Corp. v. GTE Directories Corp.,* 46 Wn. App. 351, 355, 730 P.2d 726 (1986), *review denied,* 108 Wn.2d 1013 (1987); *Knight v. Seattle–First Nat'l Bank,* 22 Wn. App. 493, 496, 589 P.2d 1279 (1979).

[18]*See also* W. Clark, Jr., *Contracts* § 10 (1931) ("A unilateral contract is so called because it is a one sided contract. The promisee is not bound to perform the requested act or forbearance but if he does perform the act or forbearance, the contract comes into existence and binds the promisor. It is a characteristic of a unilateral contract that the acceptance and the performance of the promisee take place simultaneously.") (footnotes omitted); H. Hunter, *Contracts* § 18.01 (1987); F. Whitney, *Contracts* § 2 (6th ed. 1958).

[19]DSHS, as the party asserting the existence of a unilateral contract, has the burden of proving each essential element of a unilateral contract. *Johnson v. Nasi,* 50 Wn.2d 87, 91, 309 P.2d 380 (1957).

consideration.[20] *See Harris v. Morgensen*, 31 Wn.2d 228, 240, 196 P.2d 317 (1948) (quoting 17 C.J.S. *Contracts* § 110). Where an offeree is under a preexisting duty created or imposed by law to do what he does, the offeree's performance will not suffice as consideration for a unilateral contract. 17 C.J.S. *Contracts* § 111 (1963). However, where the contract requires an additional obligation or burden not previously imposed by law, the contract is supported by consideration and is valid.[21]

In the present case, in order to perform the contract, a hospital must: (1) become a certified provider, (2) provide a covered service to a MI–GAU recipient, and (3) charge DSHS for the service provided in accordance with applicable billing instructions. Although the Hospitals have performed these services, they claim that there is no consideration to support a unilateral contract because they are under a preexisting legal duty to provide emergency hospital care. The Hospitals essentially make two claims: (1) they are legally obligated to treat Medicaid, Medicare, and MI patients; and (2) Washington case law requires hospitals to provide emergency medical care. We find both arguments to be without merit.

■ The Hospitals have no duty, created or imposed by statute or regulation, to provide MI–GAU hospital care. Although the Hospitals cite to federal authority requiring them to provide emergency medical care,[22] the Hospitals'

---

[20]The preexisting duty rule applies regardless of whether a contract is unilateral or bilateral in nature. In other words, neither the performance of a preexisting duty, nor the promise to perform a preexisting duty, constitutes consideration. *See* 1A A. Corbin, *Contracts* § 181, at 138 (1963). In the context of unilateral contracts, the historical justification for the rule appears to be that the actual performance of a preexisting duty by an offeree is not a detriment to him. Hence, the rule seems to be based on the notion of detriment as consideration.

[21]*See* Restatement (Second) of Contracts § 73, comment *b* (1981) ("The requirement of consideration is satisfied if the duty is doubtful or is the subject of honest dispute, or if the consideration includes a performance in addition to or materially different from the performance of the duty.").

[22]42 U.S.C. § 1395dd(a), (b)(1).

responsibility under this requirement is limited to stabilizing the patient's medical condition. In contrast, treatment of MI–GAU patients is not required by statute, but when it is assumed, such treatment extends beyond that of stabilization of the emergent medical condition. In other words, the Hospitals must perform acts under the MI–GAU unilateral contract which go beyond those required by federal law for Medicaid or Medicare certified hospitals. These additional obligations and acts suffice as consideration for the unilateral contract.

Similarly, the Hospitals' reliance upon *St. Luke's Hosp. v. Stevens Cy.*, 181 Wash. 360, 42 P.2d 1109 (1935), for the asserted proposition that "hospitals have 'no choice' but to treat a patient in an emergency condition", as evidence of their preexisting duty, is untenable. *St. Luke's Hospital* simply held that pursuant to statute,[23] counties were required to reimburse hospitals at a discounted rate for providing for indigents who "fall sick" within the county.

Simply stated, the Hospitals have no preexisting legal duty to treat eligible MI–GAU patients. Accordingly, we reject their claim of no consideration.

### Mutual Intent

The Hospitals also claim that DSHS has not met its burden of establishing a contract because there was no mutual intent to set reimbursement rates for MI–GAU care pursuant to unilateral contract. This argument, however, misunderstands the nature of mutual assent in the context of a unilateral contract.[24]

▮ To determine the mutual intentions of contracting parties, we follow the objective manifestation theory of contracts. *Everett v. Estate of Sumstad,* 95 Wn.2d 853, 855,

---

[23]Rem. Rev. Stat. § 9986.

[24]Mutual assent or mutual intention are the modern expressions "for the concept of 'meeting of the minds.'" *Swanson v. Holmquist,* 13 Wn. App. 939, 942, 539 P.2d 104 (1975) (quoting *Wetherbee v. Gary,* 62 Wn.2d 123, 381 P.2d 237 (1963)). Ordinarily, the existence of mutual assent is a question of fact. *Weimerskirch v. Leander,* 52 Wn. App. 807, 813, 764 P.2d 663 (1988).

631 P.2d 366 (1981).[25] Thus, the unexpressed subjective intention of the parties is irrelevant; the mutual assent of the parties must be gleaned from their outward manifestations. *Everett,* at 855; *Washington Shoe Mfg. Co. v. Duke,* 126 Wash. 510, 516–17, 218 P. 232, 37 A.L.R. 611 (1923). To determine whether a party has manifested an intent to enter into a contract, we impute an intention corresponding to the reasonable meaning of a person's words and acts. *Everett,* at 855; *American States Ins. Co. v. Breesnee,* 49 Wn. App. 642, 646, 745 P.2d 518 (1987). Accordingly, if the Hospitals, judged by a reasonable standard, manifested an intention to agree to the arrangements in question, that agreement is established regardless of the Hospitals' real, but unexpressed, intent. *Everett,* at 855–56; *Wesco Realty, Inc. v. Drewry,* 9 Wn. App. 734, 735, 515 P.2d 513 (1973).

Turning to the facts at hand, we conclude that, by providing the MI–GAU care, the Hospitals agreed to the payment rates which are included within the Core Provider Agreement. The Hospitals were under no obligation to accept the terms of the contract. Upon voluntary performance of those terms, however, the only reasonable intent which can be imputed to their acts is that they assented to the terms of the contract, including the payment rates. The Hospitals are not entitled to perform the contract and then argue that there was no mutual intention that the contract establish the payment rates. Such a result would be a legal absurdity. DSHS's offer would no longer be certain or controlled by the Department; rather, under the Hospitals' theory, a hospital could accept the terms of the contract and then argue for a better contract. That is a result we refuse to sanction. Having voluntarily performed the necessary services, the Hospitals accepted the terms of the contract and cannot now argue that they did not intend for

---

[25]*See also Dwelley v. Chesterfield,* 88 Wn.2d 331, 335, 560 P.2d 353 (1977); *Weimerskirch v. Leander, supra* at 813; *American States Ins. Co. v. Breesnee,* 49 Wn. App. 642, 646, 745 P.2d 518 (1987); *American Agency Life Ins. Co. v. Russell,* 37 Wn. App. 110, 116, 678 P.2d 1303 (1984).

MI–GAU payment rates to be set thereby. The Agreement is an express unilateral contract that includes a definite method of payment to which the Hospitals manifested their assent when they performed its requisite terms.

In sum, we find that the proper interpretation of the term "contract" as used in RCW 74.09.120 is the common law meaning of the term. RCW 74.09.120 allows for the purchase of MI–GAU hospital care by unilateral contract. In addition, we find that there is a valid unilateral contract for the purchase of MI–GAU hospital care between DSHS and the Hospitals.

## II
### VALIDITY OF WAC 388–87–070

We next address the Hospitals' challenge to the validity of WAC 388–87–070. The trial court concluded that the purchase of MI–GAU hospital care pursuant to the variable ratable reduction methodology contained in WAC 388–87–070(6) was beyond DSHS's statutory authority under RCW 74.09.120 and invalidated WAC 388–87–070 to the extent that it or any part thereof authorized variable ratable reductions.

To determine the validity of a challenged regulation,[26] we begin with the presumption that administrative rules and regulations adopted and enacted by an agency pursuant to statutory authority are valid if they are reasonably consistent with the statute being implemented.[27] *State v. Ford*, 110 Wn.2d 827, 831, 755 P.2d 806 (1988).[28]

---

[26]The review of agency rules to ascertain whether an agency has exceeded its statutory authority is generally a question of law. *State v. Ford*, 110 Wn.2d 827, 831, 755 P.2d 806 (1988). Accordingly, we review the present challenge to WAC 388–87–070 de novo.

[27]In reviewing an agency rule, a court is not free to substitute its judgment for that of the agency. *Brannan v. Department of Labor & Indus.*, 104 Wn.2d 55, 60, 700 P.2d 1139 (1985); *Weyerhaeuser Co. v. Department of Ecology*, 86 Wn.2d 310, 314–15, 545 P.2d 5 (1976).

[28]*See also Federated Am. Ins. Co. v. Marquardt*, 108 Wn.2d 651, 654, 741 P.2d 18 (1987); *Ravsten v. Department of Labor & Indus.*, 108 Wn.2d 143, 154,

The burden of overcoming this presumption of validity rests upon the party challenging the rule. *Federated Am. Ins. Co. v. Marquardt,* 108 Wn.2d 651, 654, 741 P.2d 18 (1987); *Ravsten v. Department of Labor & Indus.,* 108 Wn.2d 143, 154, 736 P.2d 265 (1987). The party challenging the rule must demonstrate, with compelling evidence, that the rule conflicts with the intent and purpose of the legislation which it implements. *American Network, Inc. v. Utilities & Transp. Comm'n,* 113 Wn.2d 59, 69, 776 P.2d 950 (1989); *Ravsten,* at 154; *Hi–Starr, Inc. v. Liquor Control Bd.,* 106 Wn.2d 455, 459, 722 P.2d 808 (1986); *Converse v. Lottery Comm'n,* 56 Wn. App. 431, 435, 783 P.2d 1116 (1989). Consequently, in the present case, the Hospitals must demonstrate, with compelling evidence, that WAC 388–87–070 conflicts with the intent and purpose of RCW 74.09.120. We conclude that the Hospitals have failed to satisfy this burden.

 First, it appears that WAC 388–87–070 is facially consistent with RCW 74.09.120. RCW 74.09.120 does not define the type of reimbursement or provide a standard by which to measure the appropriateness of the reimbursement terms when DSHS elects to purchase hospital care pursuant to the contract method. Accordingly, the statutory language does not exclude variable ratable reductions. Furthermore, the variable ratable reductions are consistent with the statutory mandate to maintain expenditures within the scope of available funds.[29] *See* RCW 74.09.700(1) and RCW 74.09.035(1).

We also note that deference to the agency interpretation of the statute is appropriate when the agency is charged with the responsibility for administering the statute. *Green River Comm'ty College Dist. 10 v. Higher Educ. Personnel Bd.,* 107 Wn.2d 427, 438, 730 P.2d 653 (1986); *Moses v.*

---

736 P.2d 265 (1987); *Hi–Starr, Inc. v. Liquor Control Bd.,* 106 Wn.2d 455, 459, 722 P.2d 808 (1986); *Brannan v. Department of Labor & Indus., supra* at 60.

[29]The record indicates that DSHS adopted WAC 388–87–070 in order to maintain expenditures within the scope of available funds.

*Department of Social & Health Servs.*, 90 Wn.2d 271, 274, 581 P.2d 152 (1978). Here, we do not find DSHS's regulation to be inconsistent with RCW 74.09.120.

Finally, additional support can be inferred from the absence of action to correct any conflict between the statute and the regulation. The Legislature was well aware of WAC 388–87–070 and took no action to prohibit the variable ratable reductions. In the operating budget for the 1985–87 biennium, the Legislature instructed DSHS to continue ratable reductions on MI–GAU payments. Laws of 1985, 1st Ex. Sess., ch. 6, § 210(4). Similarly, in the operating budget for the 1989–91 biennium, the Legislature instructed that:

> The appropriations in this section are subject to the following conditions and limitations:
>
> . . . .
>
> (3) The department [DSHS] shall continue variable ratable reductions for the medically indigent and general assistance—unemployable programs in effect November 1, 1988.

Laws of 1989, 1st Ex. Sess., ch. 19, § 213(3).

In sum, the Hospitals have not established, with compelling evidence, that WAC 388–87–070(6) conflicts with the intent and purpose of RCW 74.09.120. Accordingly, we reverse that part of the trial court's decision which invalidated WAC 388–87–070.

## III
### ARBITRARY AND CAPRICIOUS

The Hospitals next argue that DSHS acted arbitrarily and capriciously in administering WAC 388–87–070(6). WAC 388–87–070(6) requires DSHS to classify hospitals into three groups depending upon the hospital's percentage of MMBC revenue. Under WAC 388–87–070(6), the percentage reduction in MI–GAU payments depends upon the hospital's group classification. Under the regulation, hospitals with a higher percentage of MMBC revenue are presumed to be least able to absorb losses and, therefore, receive the lowest percentage reduction in MI–GAU payments.

On October 1, 1985, the most complete data for all hospitals was the Hospital Commission 1983 year-end conformance (YEC) data which showed each hospital's percentage of MMBC revenue. Although the Hospitals requested that DSHS use the most complete Commission data available in administering WAC 388-87-070(6), DSHS has used the 1983 YEC data from October 1, 1985 to the date of trial and has not regrouped the Hospitals. The Hospitals now argue that DSHS's failure to regroup the Hospitals, as new data became available, is arbitrary and capricious.

Although the trial court noted that it was unnecessary to reach this issue, it nonetheless agreed with the Hospitals and found DSHS's administration of WAC 388-87-070(6) arbitrary and capricious. DSHS now asks us to review this determination.

█ Rules of statutory construction apply to the interpretation of administrative rules and regulations. *State v. Burke,* 92 Wn.2d 474, 478, 598 P.2d 395 (1979). Accordingly, when faced with an unambiguous regulation, the court may not speculate as to the intent of the regulation or add words to the regulation. *Vita Food Prods., Inc. v. State,* 91 Wn.2d 132, 134, 587 P.2d 535 (1978). *See also Allen v. Employment Sec. Dep't,* 83 Wn.2d 145, 148, 516 P.2d 1032 (1973). Our task is not to question the wisdom of a particular regulation; rather, our review is limited to determining what the regulation requires.

█ In the present case, the plain language of WAC 388-87-070(6) does not require periodic regrouping of the hospitals. The regulation, in relevant part, provides:

> For dates of admission beginning October 1, 1985, [MI–GAU payments] are reduced . . . Hospitals are grouped according to the percentage of total rate setting revenue comprising medical assistance, medicare, bad debt, charity, and other contractual adjustments and rates are reduced according to the following table.

WAC 388-87-070(6). Because the regulation is silent as to any requirement for periodic regrouping, the trial court's

finding of fact to the contrary is erroneous. The trial court's finding essentially amends WAC 388–87–070(6) to require periodic regrouping as new data becomes available. In so doing, the trial court erred. Because we conclude that WAC 388–87–070(6) does not require periodic regrouping, it is unnecessary to consider DSHS's reason for not regrouping the Hospitals.

## IV
### CONCLUSION

In conclusion, we hold that RCW 74.09.120 allows DSHS to purchase MI–GAU hospital care pursuant to unilateral contract and that the Core Provider Agreement constitutes a valid unilateral contract between the parties. Further, we reverse that part of the trial court's decision which invalidated WAC 388–87–070. Finally, we reverse the trial court's decision that DSHS was arbitrary and capricious in administering WAC 388–87–070(6). Accordingly, the trial court is reversed and the case remanded for judgment to be entered in favor of DSHS.

CALLOW, C.J., and DOLLIVER, DORE, ANDERSEN, SMITH, and GUY, JJ., concur.

UTTER, J. (dissenting)—I dissent. The findings of fact made by the trial court establish that the hospitals did not agree to DSHS' reimbursement formula. In order to create a contract without the benefit of favorable factual findings, the majority makes an offer from an enrollment form, consideration from legally obligated treatment of hospital patients, and a meeting of the minds from express disagreement. It then fails to acknowledge its own statement that this "offer" did not specify reimbursement rates. By so doing it enables the majority to create a "contract" which includes a term neither party contemplated at the time.

If DSHS feels that policy considerations require an expansion of its authority, it may ask the Legislature to

approve apportioning reimbursement to profit rather than costs. We, however, lack the power to amend the statute and should not attempt to do so here.

The majority's use of unilateral contract theory to limit the ability of hospitals to challenge the administration of a benefits program is unprecedented and unsound. Unilateral contracts have hitherto forced promisors to pay those who perform an offer's terms. *See generally* Petit, *Modern Unilateral Contracts,* 63 B.U.L. Rev. 551, 552 (1983). The majority's ruling requires nothing from DSHS, the promisor under the majority's theory, but uses a supposed promise of DSHS to inhibit the hospitals' ability to challenge the administration of a program reimbursing it for its treatment of the poor. The holding creates precedent which can effectively insulate administrative agencies administering benefits programs in disregard of statutory limitations from recipients' challenges.

The majority's unilateral contract includes no language referring to variable rate reduction. The majority incorrectly states that the "Core Provider Agreement" (Agreement) includes payment rates. Majority, at 587. But "[t]he Agreement does *not* specify the reimbursement rates". (Italics mine.) Majority, at 576. Nor does it mention variable rate reduction, the methodology at issue here.

Trial court findings not challenged on appeal compel the conclusion that this document did not "offer" variable rate reduction. The majority says its decision to consider a novel theory raised for the first time on the motion for reconsideration justifies ignoring the trial court's findings of fact. Majority, at 581 n.14. The majority cites no case law to support this remarkable decision. Because the findings of fact show conclusively that the Agreement did not include variable rate reduction, they are highly relevant to the question of whether a contract was formed as to variable rate reduction. After all, DSHS argued that this Agreement was the offer forming the basis of the unilateral contract.

Uncontested findings of fact are verities on appeal. *Metropolitan Park Dist. v. Griffith,* 106 Wn.2d 425, 433, 723 P.2d 1093 (1986).

When WAC 388-87-070 first required use of the Agreement, the MI and GAU programs did not exist in their present form. Finding of fact 9. The Agreement is not renewed on a yearly basis, let alone every time DSHS changes its reimbursement regulation. Finding of fact 13. DSHS developed this document because Medicaid required it, not to specify rates for the MI–GAU program. Clerk's Papers, at 396–97, 404.[30]

Neither DSHS nor the hospitals thought the Agreement offered variable rate reductions when it was signed. Clerk's Papers, at 312. Indeed, DSHS' cover letter to the Agreement explicitly stated that the Agreement "does not include requirements beyond those by which providers are already bound." Clerk's Papers, at 234. In 1981, when this Agreement was circulated, providers were not bound to accept variable rate reduction. DSHS did not use variable rate reduction until 1983. Majority, at 576–77.

The trial court's conclusion that this Agreement was actually a "method of enrollment for program participation, and really nothing more", is absolutely correct. Report of Proceedings, at 39 (June 8, 1989). The majority magically creates an offer of variable rate reduction from an enrollment form signed before variable rate reduction was introduced and before the MI–GAU program existed in its current form.

Performance of the terms of an offer can establish a unilateral contract, but it cannot change the offer's terms. The majority recognizes that this signed enrollment form did not create a bilateral contract. Majority, at 581. The majority's conclusion that no bilateral contract existed cannot be based on lack of consent to its terms. It was signed. The Agreement does not create a bilateral contract because its

---

[30]The court made no specific factual finding on this point, but the record amply supports it.

terms did not indicate assent to variable rate reduction. Even if the majority is correct that the hospitals indicated consent to the Agreement by performance, as well as by signing it, this double consent does not alter the Agreement's content.

Any contract, even a unilateral one, requires a meeting of the minds as to essential terms. *See Estate of Bogley v. United States*, 514 F.2d 1027, 1038 (Ct. Cl. 1975) (unilateral promise accepted by performance creates a unilateral contract because there was a meeting of the minds as to essential terms); *Coleman v. Holecek*, 542 F.2d 532, 535 (10th Cir. 1976) (unread signed form does not form basis of unilateral contract because there was no meeting of the minds); *Watson v. Idaho Falls Consol. Hosps., Inc.*, 111 Idaho 44, 720 P.2d 632 (1986) (employment manual can create a unilateral contract when employee's work indicates intention to accept promises in the employment manual). In a unilateral contract, the promise is unilateral, but the intention to contract remains bilateral. *See Farley v. Clark Equip. Co.*, 484 S.W.2d 142, 147–48 (Tex. Civ. App. 1972) (performance does not create a unilateral contract because there was no mutual intention to contract). One party simply indicates the intention to contract by performance rather than by making a promise. *See* Restatement (Second) of Contracts § 18 (1979) (assent manifested by conduct or words); *see generally* Petit, *Modern Unilateral Contracts*, 63 B.U.L. Rev. 551, 552 (1983).

The intent to contract is a factual question. *Weimerskirch v. Leander*, 52 Wn. App. 807, 813, 764 P.2d 663 (1988). The party arguing for a contract's existence must establish the intent to contract. *Johnson v. Nasi*, 50 Wn.2d 87, 91, 309 P.2d 380 (1957). Because Washington uses an objective theory of contract, DSHS in this case must show that the reasonable meaning of DSHS' and the hospitals' words and actions indicates an intention to contract for variable rate reduction. *See Everett v. Estate of Sumstad*, 95 Wn.2d 853, 855, 631 P.2d 366 (1981).

The majority makes a meeting of the minds out of express disagreement. The objective evidence shows that the hospitals did not intend to agree to the nonexistent variable rate reduction term. The "offer" does not mention the term. The only record evidence about the hospitals' intention with regard to variable rate reduction is that they did not intend to agree to it. They informed the Department of their objections in the fall of 1985 and filed this lawsuit in 1986.

The reasonable meaning of DSHS' actions is that it never intended to seek an agreement about variable rate reduction. Rather, DSHS thought that it had the statutory authority to impose this reimbursement method upon hospitals and did so by regulation. See majority, at 577–79. DSHS did not rely upon its contractual authority under RCW 74.09.120 in promulgating these regulations. It relied upon its power to compel compliance with general rules under RCW 74.08.090. Nor did DSHS ever attempt to modify the Agreement to include variable rate reduction.

DSHS' actions since the Agreement shows even more forcefully that it did not intend to bind itself by this "offer". DSHS changed its method of reimbursement repeatedly in the years since the Agreement was signed. It did not violate a contract thereby, because the Agreement involved no promise which would bind DSHS to pay according to any particular formula. An offer not manifesting an intention to be bound is not an offer and cannot form the basis of a contract. *See Panto v. Moore Business Forms, Inc.,* 130 N.H. 730, 735, 547 A.2d 260 (1988) (classic unilateral contract includes offeror's promise to be bound); *Chasan v. Village Dist. of Eastman,* 128 N.H. 807, 815, 523 A.2d 16 (1986) (writing not using the word "offer" or otherwise manifesting intention to be bound cannot be the basis of a unilateral contract); *Chauvin v. Bohn,* 411 So. 2d 442, 445 (La. 1982) (offer must declare party's intention to be bound); *Augustus v. John Williams & Assocs., Inc.,* 92 N.M. 437, 440, 589 P.2d 1028, 1031 (1979) (accepted offer omitting an essential term shows no intent to be bound and

forms no contract); *see also Owens–Corning Fiberglas Corp. v. Fox Smith Sheet Metal Co.,* 56 Wn.2d 167, 172, 351 P.2d 516 (1960) (letters not manifesting an intention to be bound form no contract). This court cannot say that a contract exists here unless it is prepared to enforce the contract against DSHS when it changes its methodology to the detriment of these hospitals.

This "contract" not only lacks any objective indication that either party intended to make an agreement about the matter at issue here, it lacks consideration as well. The majority argues that the treatment of indigent patients constitutes consideration for DSHS' "promise" to pay according to variable rate reduction. See majority, at 586. The majority recognizes that performance of a preexisting legal obligation is not valid consideration, but argues incorrectly that the hospitals have no statutory obligation to treat "MI–GAU patients." Majority, at 585–86.

The terms of the federal Emergency Medical Treatment and Active Labor Act doom the majority's attempt to exempt these unfortunate "MI–GAU patients" from its protections. The act requires emergency medical treatment of "any individual (whether or not eligible for benefits under [medicare])". 42 U.S.C. § 1395dd(a), (b)(1). The hospital that fails to obey this law can incur civil penalties of $50,000 per violation, even if the individual is an "MI–GAU patient". 42 U.S.C. § 1395dd(d)(2)(A).

Neither the majority nor DSHS cite a single page in the record supporting the notion that the hospitals exceeded the requirements of the federal law in order to take advantage of variable rate reduction. Absent some support in the record, the State cannot meet its burden of proving consideration, an essential element to any contract.

Moreover, DSHS did not bargain for this "consideration". *See Huberdeau v. Desmarais,* 79 Wn.2d 432, 440, 486 P.2d 1074 (1971) ("consideration will . . . render a promise enforceable if it was 'something bargained for"). DSHS did not offer variable rate reduction as an inducement to treatment of the indigent; indeed, it is a disincentive. Nor does

the record show bargaining for treatment of the indigent. DSHS did not bargain for this treatment because it is legally required. The majority's attempt to eviscerate the law requiring treatment is dangerous to the seriously injured poor.

CONCLUSION

The trial court correctly concluded that the hospitals did not agree to variable rate reduction. Because DSHS cannot require variable rate reduction absent a contract, the regulations establishing variable rate reduction are invalid. I would affirm the trial court's decision striking the regulation.

BRACHTENBACH, J., concurs with UTTER, J.

Reconsideration denied September 5, 1990.