
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ROGER BEL AIR and NICK BRINEY, doing business as BEL AIR & BRINEY, a Washington general partnership, | ) ) ) ) | No. 69856-7-I |
| | ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| 1ST SECURITY BANK OF WASHINGTON, | ) ) ) ) | |
| Respondent. | ) | FILED: April 7, 2014 |

SCHINDLER, J. — Bel Air & Briney appeal summary judgment dismissal of the breach of contract action against 1st Security Bank of Washington. We affirm.

## FACTS

Koichi Yagi, his son Peter Yagi, his daughter Kandace Yagi, and her husband Richard Furukawa (collectively the Yagis) purchased and jointly owned commercial real estate in the Seattle area. The testamentary trust of Koichi's deceased wife Anna also held an ownership interest in the properties.[1]

On December 17, 2002, Washington Credit Union obtained a default judgment against Koichi in the amount of $31,054.72. 1st Security Bank of Washington (Bank) is

---

[1] We refer to the individual members of the Yagi family by their first names for purposes of clarity and mean no disrespect by doing so.

the successor in interest to Washington Credit Union. The Bank obtained a judgment lien on a six-unit apartment building in SeaTac owned by the Yagis.

When the local real estate market collapsed, after the Yagis unsuccessfully attempted to refinance, they sold several commercial properties at a loss. In August 2006, the Yagis obtained a loan from Bel Air & Briney (BA&B). BA&B is a general partnership owned by Roger Bel Air and Nick Briney. BA&B makes direct commercial loans and purchases "discounted contracts." BA&B agreed to loan $200,000 to the Yagis for a fee of $10,000.

The promissory note states the Yagis promise to pay BA&B $210,000 "with interest on the unpaid principal balance at the rate of twelve percent (12.0%) per annum from the date of closing." The note provides that the loan is payable in installments of $2,100 due on the 14th of every month for six months and on February 14, 2007, "the unpaid balance of principal with unpaid interest due shall be due and payable in full." The note also states that if the Yagis fail to make any payment when due, a 24 percent default interest will apply as well as late charges calculated at 10 percent of each late payment. The promissory note was secured by a deed of trust on the SeaTac apartment building owned by the Yagis.

The Yagis made six monthly interest payments of $2,100 but were not able to pay the balance due on February 14, 2007. BA&B agreed to extend payment of the balance due from February 2007 to February 2010. Peter Yagi filed a petition for bankruptcy relief in September 2010.

On October 7, 2010, BA&B filed a complaint against Koichi Yagi, Peter Yagi, Kandace Yagi, her spouse Richard Furukawa, and the testamentary trust of Anna Yagi.

BA&B alleged the defendants were in default and owed $178,283.79 on the promissory note.

On November 3, BA&B obtained a default judgment against Koichi, Kandace, Furukawa, and the testamentary trust in the amount of $183,580.75. Kandace, Furukawa, and Koichi filed for bankruptcy on January 6, 2011. Koichi died on September 3, 2011. In his will, Koichi named Kandace as the personal representative of his estate.

On January 4, 2012, Briney called the Bank and spoke to Loan Control Representative Paula Smith. Briney told Smith that he held a deed of trust on the apartment building the Yagis owned and he knew the Bank had a judgment lien recorded against the property as a result of the 2002 judgment entered against Koichi. Briney told Smith the apartment "was possibly going to foreclosure" and that he "wanted to settle the judgment so he would have clear title." At the time, the total amount owed on the judgment was $60,790.72. In a letter to Briney dated January 4, Smith offered to release the judgment against Koichi if Briney paid $30,000 to the Bank. Smith stated that the offer "will remain through May 1, 2012." The letter states, in pertinent part, "1st Security Bank of Washington will accept $30,000 to release our judgment."

In early April, Briney called Smith and asked if the Bank would reconsider the offer. Briney wanted the Bank to assign the judgment to him instead of releasing it. Smith told Briney that an assignment "would be fine with the Bank."

In late April, Briney asked Smith if the Bank would extend the time to accept the offer. On April 27, Smith sent an e-mail to Briney stating that the Bank "will be happy to extend our offer to you through the 30th of May.

3

BA&B reached a settlement with Kandace and Furukawa. On May 1, BA&B's attorney sent the attorney representing the Koichi estate, Kandace, and Furukawa a "Stipulation and Agreement to Pay Judgment" (Stipulation) signed by Briney and Bel Air. The Stipulation states that Kandace and Furukawa agree to pay BA&B $217,500 on a payment schedule. The Stipulation states that "[o]n completion of these payment terms, the plaintiffs will release their deed of trust and judgment liens against the secured property and all defendants, and execute a full satisfaction of judgment in this matter." The letter asks the attorney for the estate to verify that payment of the $217,500 would satisfy the 2010 judgment in favor of BA&B and not the 2002 judgment the Bank obtained against Koichi. The letter states, in pertinent part:

> Bel Air & Briney has discovered that a judgment was entered against Koichi Yagi in 2002 in favor of Washington Credit Union (now First Security Bank of Washington) . . . . Bel Air & Briney might acquire that judgment by assignment.
>
> . . . .
> I assume it was intended that the only judgment referred to in [the Stipulation] is the one Bel Air & Briney has obtained against your clients. I am simply asking you to confirm that if Bel Air & Briney acquires the First Security Bank of Washington judgment, timely payment of the $217,000 will not also satisfy the First Security Bank of Washington judgment.

On May 1, Smith and Briney exchanged e-mails regarding the Bank's offer to assign the judgment. On May 2, Smith asked for Briney's address in order to prepare a letter confirming the Bank's offer. Briney provided the address and name of BA&B. According to Smith, "This was the first that I was informed that Mr. Briney was associated with a company." Smith sent Briney a letter confirming the Bank's offer to assign the judgment to BA&B if BA&B paid $30,000. The letter states, "1st Security Bank of Washington, fda Washington Credit Union agrees to assign the judgment: Washington Credit Union vs. Koichi Yagi for the sum of $30,000.00."

4

That same day, Smith sent an e-mail to Briney stating that the Bank would prefer a cashier's check or certified funds and told Briney that he could deliver the check to the Bank's office. Briney replied that he was "not in a big hurry" and that "[c]oming to your office to 'close' this would be fine." Smith responded that she would be out of the office on Friday, May 4 and would be back in the office on Monday, May 7.

On May 9, the attorney for the estate sent an e-mail to the attorney for BA&B confirming that the Stipulation between Kandace, Furukawa, and BA&B did not affect the 2002 judgment the Bank obtained against Koichi: "[T]here wasn't any intent in this agreement to discharge a separate judgment held by Washington Credit Union, a non-party."

On May 10, the attorney for the estate sent an e-mail to the Bank stating he represents the estate and Kandace as the personal representative of the estate. The attorney attached a copy of Koichi's death certificate and Koichi's will designating Kandace as the personal representative. The attorney states that he recently learned of the existence of the 2002 judgment the Bank held against Koichi. The attorney's e-mail states, in pertinent part:

> [T]here appears to be a ten-year-old judgment in King County Superior Court Case No. 02-2-22968-9, in favor of Washington Credit Union and against Koichi Yagi (December 17, 2002). The purpose of my inquiry is to determine: (1) whether First Security Bank is the legal successor-in-interest to Washington Credit Union and thus has an interest in the 2002 judgment, and (2) if so, who at [the Bank] has authority to negotiate a payment of the judgment.

Smith responded to the attorney's e-mail the afternoon of May 10 and asked the attorney to call her. The attorney for the estate called and told Smith that the debtor Koichi Yagi was deceased and that he was representing Koichi's heirs. The attorney

also told Smith that Koichi's heirs were in negotiations with BA&B to settle a separate debt. Smith told the attorney that the Bank had an outstanding offer to BA&B to purchase the 2002 judgment for $30,000.

After talking to the attorney for the estate, Smith sent an e-mail to Briney asking, "Where do we stand? We received some paperwork . . . from attorney Robert Wilson [who] represents [the] estate of Koichi Yagi & personal rep Kandace Yagi." In response, Briney tried to reach Smith by phone and left a voicemail about coming to Smith's office to "complete the transaction." Briney also sent an e-mail to Smith stating, "Paula: Please call me." That same afternoon, Briney purchased a cashier's check payable to the Bank in the amount of $30,000. Briney called the Bank and left Smith a second voicemail message the next day, May 11.

On May 11, the attorney for the estate offered to pay $32,000 to satisfy the judgment "on the condition of customer confidentiality and privacy." The Bank accepted the estate's offer. Later that day, Smith called Briney to tell him that "the Bank was going to satisfy the judgment on Monday" and revoked the Bank's offer to assign the judgment to BA&B. Smith later said she had no reason to think Briney would object to satisfaction of the judgment: "Satisfying the judgment with the debtor's estate would place Mr. Briney and [BA&B] back into first position on the debtor's property, which was the only reason given to the Bank as the need for this transaction."

On May 18, the Bank filed a "Full Satisfaction of Judgment" in King County Superior Court stating that "the judgment entered herein on December 17, 2002 has been fully paid, and the Clerk is authorized and directed to enter a full satisfaction of judgment."

On September 20, 2012, BA&B filed a breach of contract lawsuit against the Bank. BA&B alleged that the Bank and BA&B "were parties to a contract whereby the Bank agreed to transfer its interest in the 2002 Judgment to Bel Air & Briney in return for . . . payment of $30,000 by May 1, 2012." BA&B alleged that the Bank later agreed to extend the deadline until May 30. BA&B sought damages in the amount of $30,790.72, "the difference between the amount Koichi owed on the 2002 Judgment in May 2012 ($60,790.72) and the $30,000 the Bank had agreed to accept from Bel Air & Briney in exchange for the assignment of the 2002 judgment."

The Bank filed a motion for summary judgment dismissal of BA&B's claim. The Bank asserted that because BA&B never accepted the Bank's offer, a binding contract was not formed. The Bank asserted the January 4 letter offering to release the judgment and the May 2 letter offering to assign the judgment in exchange for $30,000 could be accepted only by performance. The Bank stated there was no evidence that BA&B performed by paying the Bank $30,000.

In support, the Bank submitted a declaration from Paula Smith. Smith states that the January 4 and May 2 letters she wrote on behalf of the Bank were offers that could only be accepted by full payment of the $30,000:

> My letters to Mr. Briney of January 4th and May 2nd respectively were offers that can only be accepted by tendering the full amount of the funds. The Bank did not seek a promise to tender the $30,000, nor would we accept such a promise. As a Loan Control Specialist, much of my duties include collecting bad debts and judgments. We do not typically agree to take any action until we first receive payment in full of the agreed funds. In this business we often are promised many things as we attempt to collect a debt. Just as often those promises are not fulfilled.

In opposition, BA&B did not dispute that the offers from the Bank could be accepted only by performance. But BA&B claimed that it performed by purchasing a cashier's check and placing phone calls to the Bank.

The court granted the motion for summary judgment and dismissed the lawsuit against the Bank. The order states, in pertinent part:

> THE COURT FINDS that the offers of Defendant 1st Security Bank of Washington (the "Bank") to Plaintiffs were offers of unilateral contract that can only be accepted by full performance;
> THE COURT FINDS that Plaintiffs [sic] efforts in obtaining a cashier's check and placing phone calls to the Bank were merely preparations to perform and do not constitute part performance of the Bank's unilateral offer; and
> THE COURT FURTHER FINDS that Plaintiff failed to fully perform as required in the Bank's offers and, therefore, no contract was created.

BA&B appeals.

## ANALYSIS

BA&B contends the court erred by dismissing its lawsuit against the Bank. BA&B argues that purchasing a cashier's check and leaving the voicemails on May 10 and 11 constituted part performance and created an enforceable unilateral contract. The Bank argues that because BA&B merely took steps to perform, no enforceable contract exists. We agree with the Bank.

The law recognizes two kinds of contracts: bilateral and unilateral. Multicare Med. Ctr. v. Dep't of Soc. & Health Servs., 114 Wn.2d 572, 583, 790 P.2d 124 (1990), overruled in part by statute on other grounds as stated in Neah Bay Chamber of Commerce v. Dep't of Fisheries, 119 Wn.2d 464, 832 P.2d 1310 (1992). The essential distinction between a bilateral and a unilateral contract is the method of acceptance. Multicare, 114 Wn.2d at 584. Under a unilateral contract, an offer cannot be accepted

8

by promising to perform. Rather, "the offeree must accept, if at all, by performance, and the contract then becomes executed." Multicare, 114 Wn.2d at 584.

> "[T]he offer or promise of the one party does not become binding or enforceable until there is performance by the other party, whereas, [in a bilateral contract], it is not performance which makes the contract binding, but rather the giving of a promise by the one party for the promise of the other."

Multicare, 114 Wn.2d at 584[2] (quoting Higgins v. Egbert, 28 Wn.2d 313, 317-18, 182 P.2d 58 (1947)). For purposes of a unilateral contract, "consideration consists of the offeree performing the requisite terms of the offer." Multicare, 114 Wn.2d at 584. An offeror may revoke an offer of unilateral contract at any time before the offeree performs. Knight v. Seattle-First Nat'l Bank, 22 Wn. App. 493, 496, 589 P.2d 1279 (1979).

Here, the May 2 letter from the Bank was an offer to assign the judgment to BA&B if BA&B paid the Bank $30,000. There is no dispute that BA&B never actually paid the Bank $30,000. Nonetheless, BA&B argues purchasing the cashier's check and leaving the voicemails for the Bank on May 10 and 11 constitutes part performance, making the unilateral contract enforceable.

The RESTATEMENT OF CONTRACTS section 45 (1932) states that if an offeree gives part of the requested consideration, the offeror of the unilateral contract is bound: " 'If an offer for a unilateral contract is made, and part of the consideration requested in the offer is given or tendered by the offeree in response thereto, the offeror is bound by a

---

[2] (Second alteration in original.)

contract.' " Knight, 22 Wn. App. at 495 (quoting RESTATEMENT OF CONTRACTS § 45).[3]

"[P]art performance by the offeree may preclude withdrawal of the offer." Knight, 22 Wn. App. at 496.

But preparation is not enough to constitute part performance, even if those steps are essential to accepting the offer. Knight, 22 Wn. App. at 498. The comments to RESTATEMENT OF CONTRACTS section 45 set forth the factors the court should consider in determining whether the offeree has performed and the unilateral contract is enforceable:

> The distinction between preparing for performance and beginning performance in such cases may turn on many factors: the extent to which the offeree's conduct is clearly referable to the offer, the definite and substantial character of that conduct, and the extent to which it is of actual or prospective benefit to the offeror rather than the offeree, as well as the terms of the communications between the parties, their prior course of dealing, and any relevant usages of trade.

RESTATEMENT (SECOND) OF CONTRACTS § 45 cmt. f (1981); see also RESTATEMENT OF CONTRACTS § 45 cmt. a.

We conclude that obtaining the cashier's check and leaving voicemails were steps taken in preparation of accepting the offer. The terms of the offer for a unilateral contract required BA&B to pay the Bank $30,000. BA&B never paid any portion of the $30,000. While BA&B's purchase of the cashier's check was clearly in reference to the Bank's offer, the undelivered cashier's check was of no actual or prospective benefit to

---

[3] The RESTATEMENT (SECOND) OF CONTRACTS discusses part performance in terms of creating an "option contract:"

> Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it.

RESTATEMENT (SECOND) OF CONTRACTS § 45 (1981). While the parties separately address whether an option contract was formed, we need not separately address the issue. The first and second RESTATEMENT OF CONTRACTS merely use different terminology in discussing part performance as a method of accepting a unilateral contract. The analysis is the same. Compare RESTATEMENT (SECOND) OF CONTRACTS § 45 cmt. f with RESTATEMENT OF CONTRACTS § 45 cmt. a.

the Bank until delivery. Further, the Bank presented evidence that in its attempts to collect debts, the Bank "do[es] not typically agree to take any action until we first receive payment in full of the agreed funds."

BA&B's attempt to distinguish Knight is unpersuasive. In Knight, the court held that the offeree did not establish an enforceable unilateral contract by merely preparing to undertake performance. Knight, 22 Wn. App. at 499. The court reasoned,

> The terms of the offer called for the withdrawal of Johnston's offer to buy and tender of the purchase price. The Knights promise to pay, absent any tender of the money, is immaterial since the offer called for acceptance by performance, not by promissory obligation.

Knight, 22 Wn. App. at 498-99. Here, just as in Knight, the offer called for tender of an amount of money and the offeree never paid.

Because an enforceable contract was not formed, the court did not err in granting the Bank's motion for summary judgment.[4] We affirm.

WE CONCUR:

---

[4] BA&B also argues for the first time on appeal that even if BA&B did not partially perform, the Bank's misconduct excuses its failure to do so. We do not address arguments raised for the first time on appeal. RAP 2.5(a); Lunsford v. Saberhagen Holdings, Inc., 139 Wn. App. 334, 338, 160 P.3d 1089 (2007).

11