[No. 26390-4-II. Division Two. January 18, 2002.]

ST. JOHN MEDICAL CENTER, *Respondent*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Appellant*.

54

*Christine O. Gregoire, Attorney General,* and *Kara A. Larsen, Assistant,* for appellant.

*Arden J. Olson* (of *Harrang Long Gary Rudnick, P.C.*), for respondent.

*Karen O. Rasmussen, Lisa Gould,* and *Sanford E. Pitler* on behalf of Auburn Regional Medical Center, amicus curiae.

SEINFELD, J. — This fee dispute between St. John Medical Center, a medical service provider, and the State Depart-

ment of Social and Health Services (DSHS) raises a question of contract interpretation. We conclude that the fee-for-service agreement at issue was a unilateral contract and that statutes, rules, and regulations adopted after the parties entered into the agreement but before St. John performed modified the agreement. Consequently, it did not cover the services St. John provided to managed care patients at the request of a managed care organization. Thus, we reverse the trial court's grant of summary judgment to St. John and remand for entry of summary judgment in favor of DSHS.

## FACTS

In 1981, St. John and DSHS entered into a "Core Provider Agreement" (CPA) that allowed St. John to provide services to Medicaid patients on a fee-for-service basis and required St. John to bill DSHS

> for services rendered to eligible recipients, as identified by a DSHS medical coupon. Reimbursement for covered services will be made according to the Schedule of Maximum Allowances, the drug formulary and other applicable payment levels or schedules. This must be accepted as sole and complete remuneration for services covered under the program. The provider may bill the recipient at the usual and customary charge for deductibles or services not covered by the program.

Clerk's Papers (CP) at 6.

The CPA also discussed the applicability of other laws and regulations to the CPA, as follows:

> The Medicaid program is authorized by Social Security Act, Title XIX of Public Law 89-97, 42 CFR Chapter IV, RCW Chapter 74.09, and WAC Chapters 388-80 through 388-95. In case of conflict or inconsistency, the following order of precedence applies.
> 
> a) 42 U.S.C., 1302-1395, et seq.,
> 
> b) Code of Federal Regulations (CFR)
> 
> c) Revised Code of Washington (RCW)

d) Washington Administrative Code (WAC)

e) [DSHS] numbered memoranda

f) Schedule of Maximum Allowances/Fee Schedules

g) Drug Formulary and Therapeutic Index

h) Billing instructions

CP at 6.

Under the fee-for-service Medicaid program, potential providers became participating providers only after DSHS assigned them a provider number and the provider billed DSHS. Participating providers had to agree "to abide by the terms of [the] agreement and by all applicable federal and state statutes, rules, and procedures," CP at 7, and were "held to all the terms of [the CPA] even though a third party may be involved in billing claims to [DSHS]." CP at 6. The CPA allowed either party to terminate the agreement with 30 days' written notice.

In 1993, DSHS began to contract with managed care organizations or providers for managed health care services to Medicaid recipients at a set rate per plan participant. *See also* former WAC 388-538-070(1) (1997) (allowing DSHS to pay for managed care services using a "capitated system" where DSHS pays the plan a set rate per plan recipient). It called the program *Healthy Options*.

In 1996, DSHS contracted with Unified Physicians of Washington (UPW) for managed care services for the 1997 calendar year. That contract authorized UPW to enter into written subcontracts with service providers and indicated that UPW had the sole responsibility to pay such subcontractors or other providers for their services.

UPW negotiated with St. John for a subcontract, offering to pay the fee-for-service Medicaid rate. St. John insisted, however, upon the full fee it charged private patients. Consequently, the parties never entered into a written subcontract.

Nonetheless, St. John treated the *Healthy Options* patients that UPW sent to it. St. John then billed UPW at its full rate. Although UPW paid St. John only the fee-for-

service rate, St. John accepted the payments. It then gave notice that it did not consider itself fully paid.

In August 1997, St. John sued UPW for the difference between the fee-for-service rate and its full rate. In September 1997, the Insurance Commissioner declared UPW insolvent and began liquidation proceedings. St. John submitted its claims to the liquidator, asserting, under an implied contract theory, that UPW had an obligation to pay the full rate for all claims. St. John sought payment for outstanding claims and for the difference between its full rate and the fee-for-service rate on all claims that UPW had previously paid. St. John further argued that it could bill the *Healthy Options* patients for any remaining balances.

In May 1999, the liquidator concluded that the CPA applied to this transaction under an implied contract theory and that the CPA was a valid unilateral contract, entitling St. John to payment at the fee-for-service rate. The liquidator also held that the CPA prohibited St. John from billing the *Healthy Options* recipients for the remaining balances.[1]

Meanwhile, during the insolvency proceedings, St. John sought reimbursement from DSHS at the CPA rate for the remaining balances on its claims against UPW. When DSHS refused to pay, St. John brought this action, asserting that DSHS was independently liable under the CPA. In the alternative, St. John sought a declaratory judgment allowing it to bill the *Healthy Options* patients for balances due.

The trial court granted St. John's motion for summary judgment as to DSHS's liability and denied DSHS's cross-motion for summary judgment. The court held that the CPA applied to the *Healthy Options* patients and that UPW had

---

[1] The liquidator classified St. John as a class 3B creditor, which meant that St. John was obligated to hold the insured harmless for services provided under the insurance contract. St. John objected to the liquidator's rulings regarding the fee rate; it also contended that it was a class 3A creditor, which would have allowed it to turn to the insureds for payment and would have entitled it to a higher preference at distribution. Eventually, St. John and the liquidator settled St. John's claims for $20,000.

acted as DSHS's agent when it directed *Healthy Options* patients to St. John and authorized their treatment. The trial court concluded that neither Medicaid regulations nor dealings between the parties modified the CPA or otherwise effected a novation relieving DSHS of liability. The trial court did not address St. John's alternative declaratory judgment request for authority to bill *Healthy Options* patients.

In its cross-motion for summary judgment, DSHS had argued that St. John (1) had an implied subcontract with UPW, (2) was "subject to all of the rules and obligations related to subcontracting with a managed care plan," and (3) could not obtain reimbursement from DSHS. CP at 337. DSHS also contended that under the CPA, St. John was obligated to comply with DSHS rules, regulations, and program instructions, including the instructions in the "General Information Booklet." DSHS further argued that the federal waivers authorizing the health maintenance programs had modified the CPA, making the health maintenance program responsible for payment. Finally, DSHS asserted that the CPA prohibited St. John from seeking payment from the *Healthy Options* patients unless the patient signed a written agreement in advance of receipt of noncovered services and the agreement met the requirements of former WAC 388-87-010(9) (1993) (repealed 2000).

At trial on damages, DSHS asserted that St. John's acceptance of UPW's payments and its act of subsequently writing off the debt was an accord and satisfaction, relieving it of any liability. The trial court found that there was no accord and satisfaction. It determined that DSHS was liable for $85,490.53 in damages and interest.

On appeal, DSHS argues that (a) under RCW 48-.31.111(2), the trial court lacked jurisdiction over this action because the action related to UPW's insurance insolvency proceedings; and (b) summary judgment in St. John's favor was inappropriate because DSHS was not independently liable to St. John and UPW did not act as its agent. DSHS

also argues that the trial court erred in finding that there was no accord and satisfaction.[2]

## DISCUSSION

### I. JURISDICTION

DSHS asserts that the liquidation court had exclusive jurisdiction over this action under RCW 48.31.111(2) because the action is "related to" UPW's insurance insolvency proceeding. DSHS also asserts that allowing the trial court to exercise jurisdiction over this action could result in inconsistent results and give St. John an unfair preference over other UPW creditors.

■ A court may hear and determine a cause or proceeding only if it has jurisdiction over the parties and the subject matter. *State v. Werner*, 129 Wn.2d 485, 493, 918 P.2d 916 (1996). A court lacking jurisdiction may do nothing more than enter an order of dismissal. *Deschenes v. King County*, 83 Wn.2d 714, 716, 521 P.2d 1181 (1974). Litigants may not waive subject matter jurisdiction; any party to an appeal may raise the issue of lack of subject matter jurisdiction at any time. RAP 2.5(a)(1); *Skagit Motel v. Dep't of Labor & Indus.*, 107 Wn.2d 856, 858-59, 734 P.2d 478 (1987); *In re Saltis*, 94 Wn.2d 889, 893, 621 P.2d 716 (1980).

■■ The Washington State Constitution confers broad original jurisdiction on the superior courts. CONST. art. IV, § 6. We narrowly construe exceptions to that jurisdictional grant. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 98-99, 864 P.2d 937 (1994); *Orwick v. City of Seattle*, 103 Wn.2d 249, 251, 692 P.2d 793 (1984).

■ Jurisdiction over insurance insolvency and related proceedings is limited by statute, as follows:

---

[2] The Washington State Hospital Association and a group of 28 health care entities and practitioners, all of which had written subcontracts with UPW and are involved in separate litigation related to the *Healthy Options* program against DSHS, have submitted an amicus brief in support of the St. John positions.

No court of this state has jurisdiction to entertain a complaint praying for the dissolution, liquidation, rehabilitation, sequestration, conservation, or receivership of an insurer, or praying for an injunction or restraining order or other relief preliminary to, incidental to, or *relating to* the proceedings, other than in accordance with this chapter.

RCW 48.31.111(2) (emphasis added). We find no Washington authority defining the phrase "relating to" in the insurance insolvency context. But we can look to the common law of other states with similar provisions and to federal bankruptcy law for guidance. *State v. Compton*, 13 Wn. App. 863, 865, 538 P.2d 861 (1975) (looking to other states for guidance on issue of first impression); *Garamendi v. Executive Life Ins. Co.*, 17 Cal. App. 4th 504, 21 Cal. Rptr. 2d 578, 585 (1993) (insurance insolvency proceedings are analogous to proceedings in bankruptcy).

*Smalls v. Weed*, 293 S.C. 364, 360 S.E.2d 531 (Ct. App. 1987), is the only case we find addressing the issue of whether an action was "related to" an insurance insolvency proceeding for jurisdictional purposes.[3] In *Smalls*, the South Carolina Court of Appeals examined whether an action brought by an insured against the Tennessee rehabilitator of an insolvent insurance company was "related to" the rehabilitation proceeding. 360 S.E.2d at 532, 534. South Carolina and Tennessee were reciprocal states under the Uniform Insurer's Liquidation Act, and the rehabilitator argued that former S.C. CODE § 38-5-1840(B) (Law. Co-op. 1976), now S.C. CODE ANN. § 38-27-60 (Law.

---

[3] Numerous states have substantially similar jurisdictional statutes. *See* COLO. REV. STAT. § 10-3-504(2); CONN. GEN. STAT. § 38a-906(b); D.C. CODE ANN. § 31-1303(b); GA. CODE ANN. § 33-37-4(b); IDAHO CODE § 41-3304(2) (Michie); IND. CODE ANN. § 27-9-1-3(b)(2); IOWA CODE § 507C.4.2; KAN. STAT. ANN. § 40-3608(b); KY. REV. STAT. ANN. § 304.33-040(3)(a) (Banks-Baldwin); ME. REV. STAT. ANN. tit. 24-A, § 4354.4 (West); MICH. COMP. LAWS § 500.8104(2); MINN. STAT. § 60B.04 (Subdivision 3); MISS. CODE ANN. § 83-24-9(2); MO. REV. STAT. § 375.1154.2; MONT. CODE ANN. § 33-2-1305(2); NEB. REV. STAT. § 44-4804(2); NEV. REV. STAT. 696B.190.4; N.H. REV. STAT. ANN. § 402-C:4.III; N.C. GEN. STAT. § 58-30-15(b); OHIO REV. CODE ANN. § 3903.04(B); R.I. GEN. LAWS § 27-14.3-4(b); S.C. CODE ANN. § 38-27-60(3)(b) (Law. Co-op.); TENN. CODE ANN. § 56-9-104(b); VT. STAT. ANN. tit. 8, § 7032(b); WIS. STAT. § 645.04(3).

Co-op.), required that the insured bring the action in Tennessee. *Smalls*, 360 S.E.2d at 534.[4]

*Smalls* held that the South Carolina court had jurisdiction over the insured's action because it was not an action "regarding or relating to the institution of the rehabilitation proceedings," but rather was an action against an insurance company that happened to be in rehabilitation. 360 S.E.2d at 534. *Smalls* concludes that the jurisdictional statute's purpose was only to ensure that "no delinquency proceedings shall be commenced or entertained except as provided for [by the relevant statute]." 360 S.E.2d at 535.

We agree with the reasoning of the South Carolina court. Its analysis, along with a narrow construction of the alleged exception to jurisdiction, *Burnside*, 123 Wn.2d at 98-99; *Orwick*, 103 Wn.2d at 251, supports the conclusion that the trial court had jurisdiction over St. John's action against DSHS. This action was against a third party and was not an attempt to institute an insolvency or delinquency proceeding.

DSHS cites federal bankruptcy law in support of its argument that this action is "related to" the UPW's liquidation proceedings because UPW and DSHS had an identity of interest. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986); *Garamendi*, 21 Cal. Rptr. 2d at 585-88.[5] But the identity of interest test is not helpful in determining whether an action is "related to" another action.

---

[4] Former S.C. CODE § 38-5-1840(B) (Law. Co-op. 1976) was substantially similar to RCW 48.31.111(2). It stated:

"No court of this State shall have jurisdiction to entertain, hear or determine any complaint praying for the dissolution, liquidation, rehabilitation, sequestration, conservation or receivership of any insurer, or praying for an injunction or restraining order or other relief preliminary to, incidental to or relating to such proceedings other than in accordance with this article."

*Smalls*, 360 S.E.2d at 534 (quoting former S.C. CODE § 38-5-1840(B) (Law. Co-op. 1976)).

[5] DSHS also cites to an "Order Denying Motion for Remand" in a case from the United States District Court of the Eastern District of Washington for support of its argument. As this is an unpublished case, we do not consider it. *See* RAP 10.4(h); *Dwyer v. J.I. Kislak Mortgage Corp.*, 103 Wn. App. 542, 548-49, 13 P.3d 240 (2000), *review denied*, 143 Wn.2d 1024 (2001).

Bankruptcy courts use the identity of interest test to determine whether the relationship between a debtor or insolvent party and a legally separate entity is sufficient to allow the bankruptcy court to assert *in rem jurisdiction* over *assets* owned by the separate entity. *A.H. Robins*, 788 F.2d at 1001; *Garamendi*, 21 Cal. Rptr. 2d at 585-86. Even if there is an identity of interest, the court must still determine whether the *action* in question affects or is "related to" the insolvency proceeding. *See A.H. Robins*, 788 F.2d at 1001-02. Further, DSHS is the sole owner of the assets at issue here; DSHS does not assert otherwise.

The proper test for determining whether an action is "related to" a bankruptcy proceeding is set forth in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984). *Fietz v. Great W. Sav.*, 852 F.2d 455, 457 (9th Cir. 1988). The "usual articulation" of this test is "whether the outcome of *that* proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor*, 743 F.2d at 994 (some emphasis omitted). "[T]he proceeding need not necessarily be against the debtor or against the debtor's property"; instead, the action is related to the bankruptcy proceeding if the outcome of the action could alter the "debtor's rights, liabilities, options, or freedom of action (either positively or negatively)" or in any way impact the handling and administration of the bankruptcy estate. *Pacor*, 743 F.2d at 994.

Although this definition of "related to" is broad, it is not limitless; there must be a sufficient nexus between the civil proceedings and the liquidation proceeding to justify the bankruptcy court's exclusive jurisdiction. *Fietz*, 852 F.2d at 457; *Pacor*, 743 F.2d at 994. An action that is merely a *precursor* to an indemnification claim against a debtor does not establish exclusive "related to" jurisdiction in the bankruptcy court. *Pacor*, 743 F.2d at 995.

Here, DSHS argues that it could assert a claim against UPW for indemnification; it does not assert that it is entitled to automatic indemnification from UPW. Although the liquidation court may have had exclusive jurisdiction if the indemnification was automatic, *see A.H. Robins*, 788

F.2d at 1005-08; *Pacor*, 743 F.2d at 995, the risk of potential liability resulting from an independent indemnification claim is not sufficient to confer exclusive jurisdiction in the liquidator on the issue of DSHS's liability to St. John. *See Pacor*, 743 F.2d at 995.

But the issue of St. John's ability to bill the *Healthy Options* patients for any remaining balance was directly before the liquidator who used his conclusion to establish St. John's and other creditors' priority classification. If we were to reconsider the issue and find differently, our decision could potentially change those priority classifications. Thus, this issue is "related to" the liquidation proceedings and was not properly before the trial court.

Finally, DSHS presents policy arguments against superior court jurisdiction. It argues that (1) the trial court's determination that there was no implied contract between St. John and UPW is inconsistent with the liquidator's determination that there was an implied contract, and (2) allowing St. John to collect from DSHS would give it an advantage over other UPW creditors. These arguments are not persuasive.

In this action, St. John asked the trial court to determine whether DSHS was *independently* liable under the CPA and whether the CPA terms were modified by St. John's subsequent relationship with UPW or by subsequent statute, regulation, rule, or other circumstance. The liquidator's finding that St. John and UPW had an implied contractual relationship was not necessarily inconsistent with the trial court's determination that DSHS was independently liable to St. John under the CPA.

Further, a ruling in favor of St. John would not give it a preference over other UPW creditors. Although DSHS might have an indemnification claim against UPW, a finding that DSHS was independently liable to St. John would not give St. John an advantage over other UPW creditors in relation to UPW assets. Thus, the trial court properly exercised jurisdiction over this issue.

## II. SUMMARY JUDGMENT ON DSHS LIABILITY

 We review summary judgment orders de novo, taking the evidence in the light most favorable to the nonmoving party and engaging in the same inquiry as the trial court. *Failor's Pharmacy v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 493, 886 P.2d 147 (1994). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

 To prevail on a breach of contract claim, St. John must show that there are no issues of material fact as to (1) the existence of a contract, (2) a material breach of that contract, and (3) resulting damage. *N.W. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995). We must determine whether the evidence and the law established DSHS's obligation under the CPA to reimburse St. John for the services it rendered *Healthy Options* patients.

DSHS argues that the CPA is a unilateral contract and that the various statutes, regulations, and DSHS rules it incorporates by reference, limit DSHS liability to St. John for those services that Medicaid covers and that the managed care plan contract does not cover. DSHS contends that because the *Healthy Options* program separately covered *Healthy Options* patients, St. John assumed the risk that UPW would not pay for St. John's treatment of those patients.[6]

St. John argues that the CPA was a bilateral contract and not modified by subsequently adopted statutes, regulations, DSHS rules, or the *Healthy Options* contract between DSHS and UPW. According to St. John, DSHS had primary liability for the services St. John provided the *Healthy Options* patients because the *Healthy Options* patients were "eligible recipients."

---

[6] DSHS also asserts that it cannot reimburse St. John because it already paid for these services when it paid UPW and paying for the same services twice would violate federal regulations. As we conclude that DSHS is not liable, we do not address this contention.

██ ██ A bilateral contract requires two independent promises: "A" promises to perform and "B" promises to perform. *Higgins v. Egbert*, 28 Wn.2d 313, 317-18, 182 P.2d 58 (1947); *Govier v. N. Sound Bank*, 91 Wn. App. 493, 499, 957 P.2d 811 (1998). The consideration for each promise is the other promise. *Govier*, 91 Wn. App. at 499. By contrast, a unilateral contract involves only one promise to perform and that promise is conditioned upon actual performance by the other. *Multicare Med. Ctr. v. Dep't of Soc. & Health Servs.*, 114 Wn.2d 572, 583-84, 790 P.2d 124 (1990); *Higgins*, 28 Wn.2d at 317-18.

██ Under the CPA, DSHS promised to pay St. John for its services at such time as St. John rendered the services and billed DSHS. But St. John did not promise to render services. It could decline to do so and suffer no adverse legal consequences. *See Multicare*, 114 Wn.2d at 588 (concluding that the CPA was an express unilateral contract). But when it did render covered services, it triggered the application of the CPA and had to act in accordance with the CPA's terms in order to enforce DSHS's promise to pay for the services. Thus, the CPA is a unilateral contract.

St. John's cite to *Caritas Services, Inc. v. Department of Social & Health Services*, 123 Wn.2d 391, 869 P.2d 28 (1994), is unpersuasive. The issue in *Caritas* was whether a statute that *retroactively* altered the reimbursement schedule violated the impairment of contracts or due process clauses of the state and federal constitutions. 123 Wn.2d at 395-96. Here, we are not dealing with the application of retroactive statutes or regulations. Moreover, *Caritas* reinforces the conclusion that the terms of the CPA may be altered prospectively by statutory and regulatory changes.

██ Having determined that the CPA was a unilateral contract, we must now construe its terms. In doing so, we give great weight to the intent of the parties, as expressed in the plain language of the contract. *In re Estate of Wahl*, 99 Wn.2d 828, 830-31, 664 P.2d 1250 (1983).

██ Under a unilateral contract, the parties may agree to define some terms as of the time of performance. *Failor's*

*Pharmacy*, 125 Wn.2d at 498. The parties did just that here by incorporating the statutes, regulations, and rules that were effective at the time St. John provided services. *Failor's Pharmacy*, 125 Wn.2d at 498; *Caritas*, 123 Wn.2d at 404. Providers must "abide by the terms of [the CPA] and by all applicable federal and state statutes, rules, and procedures." CP at 7.

 The effective statutes, regulations, and rules clearly provided that St. John was not entitled to payment from DSHS for services covered under a managed care plan, and St. John cites no authority requiring a novation under these circumstances. "The express incorporation of the statutes into the contract makes the statutory provisions relating to reimbursement a part of the obligation assumed by DSHS, just as if the statutory provisions had been spelled out in the contract." *Caritas*, 123 Wn.2d at 404. *See also Failor's Pharmacy*, 125 Wn.2d at 498; *Multicare*, 114 Wn.2d at 587-88.

Former WAC 388-538-095 (1995) (incorporated into the CPA by reference to the applicable state rules) clearly provided that DSHS was liable for services to managed care patients only if Medicaid covered those services and the managed care plan did not cover them: "[DSHS] shall pay separately, on a fee-for-service basis, *only* for medical services covered under [DSHS's] medical care programs that a managed care contract does not cover." (Emphasis added).

Additionally, former WAC 388-87-010(11) stated:

[DSHS] shall not be responsible for payment for medical care and goods or/and services provided to a client:

(a) Enrolled in a [DSHS]-contracted, prepaid medical plan when the plan covers the services; and

(b) Who fails to use the provider under contract unless the service is not covered by the prepaid plan.

Further, DSHS's 1995 "General Information Booklet" (incorporated into the CPA by reference to the applicable state procedures) indicates that DSHS will not pay for services to managed care patients unless certain specific

circumstances exist. The Booklet describes the different types of programs, tells the providers how to identify the program a patient belongs to, and provides coverage and billing information. It specifies that all *Healthy Options* recipients are required "to obtain care from or through the primary care provider" and that the *managed care plan* is "responsible for: (1) payment of covered services; and (2) payment of services referred by the plan to an outside provider." CP at 1348, 1350. It further specifies that "[m]edical services not covered under the plan's contract will be paid by MAA [Medical Assistance Administration] if they are Medicaid-covered and meet MAA coverage requirements." CP at 1350.

As the CPA specifically states that participating providers must abide by DSHS regulations and procedural rules, and as these regulations and procedures establish that DSHS is liable for managed care services only under specific circumstances not present here, St. John is not entitled to payment from DSHS for the services it provided to *Healthy Options* managed care patients. The fact that UPW could send its managed care patients to service providers who did not have CPAs with DSHS further supports the conclusion that the managed care plans and the CPA are independent sources of liability.

St. John further argues that the services it provided to managed care recipients were not covered by a managed care contract between it and UPW. But the managed care contract did cover these services. St. John also contends that UPW's failure to pay for the services proves that a managed care plan did not cover them. This contention also is not persuasive.

Former WAC 388-538-095 defined the managed care plan services as those in the contract between DSHS and UPW, not those in the contract between UPW and St. John. Additionally, St. John's argument that the phrase "covered services" includes only those services that the managed care plan actually paid for lacks legal or logical support and is inconsistent with the way DSHS regulations use the

phrase. For example, former WAC 388-86-200 (1993) and former WAC 388-87-010 clearly indicated that the phrase "covered services" refers to services that are within the scope of the managed care plan.

■ St. John also contends that the CPA was illusory if statutes, regulations, and procedures adopted or enacted subsequent to the signing of the CPA could modify its terms. An illusory contract is unenforceable because there is no consideration. *Interchange Assocs. v. Interchange, Inc.*, 16 Wn. App. 359, 361, 557 P.2d 357 (1976). After one party performs, the other has no obligation to perform. *Interchange Assocs.*, 16 Wn. App. at 360-61. This contrasts with a unilateral contract in which one party gives a promise to perform in exchange for performance by the other. *See Multicare*, 114 Wn.2d at 583-84. The contract here was not illusory because it obligated DSHS to reimburse the service provider according to the CPA's terms.

Further, even if the contract language was ambiguous, the parties' conduct does not support St. John's position. St. John billed UPW at its full rate rather than the rate set under the CPA, suggesting that it was not relying on the CPA as a source of payment.

Because the CPA expressly incorporated the statutes, regulations, and DSHS rules and procedures that disclaimed liability for services covered by managed care plans, DSHS is not independently liable for the services St. John provided to *Healthy Options* patients who were covered under the DSHS-UPW managed care plan. Thus, the trial court erred in granting summary judgment to St. John and in denying DSHS's cross-motion for summary judgment.[7]

---

[7] The amici also assert that DSHS is liable because it is the "payor of last resort" under WAC 388-87-010(1), (2). While these regulations establish that DSHS is the payor of last resort *when DSHS is liable*, it does not *establish* liability. The amici further contend that: (1) DSHS impermissibly contracted away its liability; (2) DSHS failed to comply with the federal requirement that it enter into an agreement with every person or institution providing care to Medicaid patients; and (3) DSHS failed to meet the timely payment requirements of the federal regulations. As St. John has not raised these issues, we do not address them.

### III. LIABILITY OF *HEALTHY OPTIONS* RECIPIENTS

As discussed above, the liquidation court had sole juris-
diction over this issue under RCW 48.31.111(2) as it is
"related to" the liquidation proceeding. Further, the trial
court did not address this issue because it determined that
DSHS was liable. Thus, we do not consider this contention.

### IV. DAMAGES

DSHS alleges that the trial court erred when it deter-
mined that there was no satisfaction and accord. DSHS
asserts there was a satisfaction and accord when St. John
wrote off the amounts due beyond what it received from
UPW.

▇ As we conclude that DSHS is not independently
liable, we need not address this issue. In any event, there is
substantial evidence to support the trial court's finding on
this issue. *Henderson v. Tyrrell*, 80 Wn. App. 592, 631, 910
P.2d 522 (1996).

▇ The elements of a satisfaction and accord are: (1) a
bona fide dispute, (2) an agreement to settle *that* dispute,
and (3) performance of the agreement. *Matthews v.
Wenatchee Heights Water Co.*, 92 Wn. App. 541, 554, 963
P.2d 958 (1998). The record contains no evidence of an
agreement *between St. John and DSHS* to settle the dis-
pute. If DSHS were *independently* liable to St. John, an
accord and satisfaction between St. John and UPW would
be irrelevant.

Accordingly, we reverse and remand for entry of judg-
ment in favor of DSHS.

MORGAN and HOUGHTON, JJ., concur.

Review denied at 146 Wn.2d 1023 (2002).